## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ENERGY CONVERSION DEVICES
LIQUIDATION TRUST, BY AND
THROUGH ITS LIQUIDATING TRUSTEE,    Civil Action No. 13-cv-14241
JOHN MADDEN,

                    **JURY TRIAL DEMANDED**

             Plaintiff,

       v.

TRINA SOLAR LIMITED, TRINA SOLAR
(U.S.), INC., YINGLI GREEN ENERGY
HOLDING COMPANY LIMITED, YINGLI
GREEN ENERGY AMERICAS, INC.,
SUNTECH POWER HOLDINGS CO., LTD.,
SUNTECH AMERICA, INC.,

             Defendants.

_____/

## COMPLAINT

Plaintiff Energy Conversion Devices Liquidation Trust, by and through its Liquidating Trustee, John Madden, files this complaint against Defendants Trina Solar Limited, Trina Solar (U.S.), Inc. (collectively, "Trina"), Yingli Green Energy Holding Company Limited, Yingli Green Energy Americas Inc. (collectively, "Yingli"), Suntech Power Holdings Co., Ltd., and Suntech America, Inc. (collectively, "Suntech"). Trina, Yingli, and Suntech shall hereinafter collectively be referred to as "Defendants."

Plaintiff brings this action against the Defendants under the antitrust laws of the United States, as well as the laws of the state of Michigan, against Defendants for engaging in concerted action, violating Section 1 of the Sherman Act and Section 445.772 of the Michigan Antitrust Reform Act.

## Summary of the Action

1.     The object of Defendants' illegal actions was to drive established solar industry leader Energy Conversion Devices, Inc. and its wholly-owned subsidiary, United Solar Ovonic LLC, out of business.[1]  ECD alleges that Defendants agreed among themselves, acting in concert and not as the result of independent and competitive decision making, that they would undertake to dominate the market for solar panels in the United States.  In furtherance of this agreement, Defendants agreed among themselves to coordinate the prices for and distribution of solar panels to be sold in the United States, all with the objective of driving domestic American producers/competitors (and their superior technology) from the market.  As more specifically alleged below, Defendants, in furtherance of their illegal scheme, agreed to fix prices, and coordinated among themselves a plan to sell solar panels in the American market at unreasonably low and/or below-cost prices.  ECD's innovative technology allowed ECD to establish itself as a premier solar energy company in the United States long before Defendants decided to carry out their scheme.  Before Defendants pushed ECD into bankruptcy, ECD held a consistent competitive advantage in the commercial and industrial rooftop solar market, achieving over $1 billion in sales—nearly all of which came between 2002 and 2012 when Defendants ran ECD out of business.  To eliminate ECD's strong and established presence in the American solar market, Defendants had to flood the American market with their conventional flat photovoltaic

---

[1] On February 14, 2011, Energy Conversion Devices, Inc. and United Solar Ovonic LLC (collectively, the "Debtors") filed voluntary Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the Eastern District of Michigan.  On July 30, 2012, the Bankruptcy Court entered its Findings of Fact, Conclusions of Law and Order Approving Disclosure Statement and Confirming Second Amended Joint Plan of Liquidation of Energy Conversion Devices, Inc. and United Solar Ovonic LLC.  On August 28, 2012, pursuant to the Joint Plan of Liquidation, the Debtors' assets were assigned to the Trust,  and the Trustee assumed the Debtors' responsibilities and obligations.  In addition, under the plan, all causes of action belonging to the Debtors vested in the Liquidation Trust and may be pursued by the Trustee.  Collectively, the Liquidation Trust, Energy Conversion Devices, Inc., and United Solar Ovonic LLC shall be referred to as "ECD."

solar panels, weakening ECD's position until it was ultimately eliminated entirely.  Defendants' conspiracy was successful, as shown by the fact that, in a relatively short period of time, Defendants were able to not only drive successful companies like ECD out of business but also to eliminate almost the entire American solar panel manufacturing industry.

2.      ECD's destruction at the hands of Defendants did not come about by mere coincidence.  ECD was a growing, prosperous business specializing in renewable energy for over fifty years, and it was the first company to manufacture a flexible, thin-film solar panel and a leading researcher and innovator in the solar technology field.  Just before Defendants caused ECD's financial destruction, it was the world's second largest thin-film solar company with more than 500 megawatts of installations.

3.      Defendants initially came to the United States to raise money from American investors by selling American Depositary Shares ("ADS") on the New York Stock Exchange.  Incredibly, Defendants elected to deploy the capital they raised from Americans to destroy American solar manufacturers (including flourishing businesses like ECD) and ultimately to eliminate their technologically superior panels from the consumer's decision-making process.  To achieve this goal, Defendants employed a complex scheme, in collaboration with each other and raw material suppliers and certain lenders, to flood the American solar market with solar panels at unreasonably low and/or below-cost prices.

4.      What is more, Defendants' plan to dominate the American solar market was coordinated and agreed to by Defendants and enabled by trade associations and certain government-related commercial entities, such that Defendants conspired to export more than 95% of their production, dump their products in the United States at artificially low prices, and achieve market domination.  In fact, Suntech's then-CEO even admitted to the illegal conduct at

issue, noting, "Suntech, to build market share, is selling solar panels on the American market for less than the cost of materials, assembly, and shipping."

5.      Further to their conspiracy, the three Defendants' agreed to and moved their prices in tandem—falling 75% in five years as their massive imports hit the American market. Consistent with their unlawful and concerted action, two Defendants share an address (Yingli and Trina), and the two senior-most executives of Trina and Suntech work together on the board of a Chinese trade association with the stated purpose of "collaboration."  Defendants' actions defied short term economic principles—instead of seeking profitability, Defendants sold their solar panels at any cost necessary to support full employment in the Chinese manufacturing facilities and handsome payments to their executives.

6.      Unfortunately for ECD and American consumers, Defendants' plan worked— Defendants' concerted actions destroyed not only successfully established businesses like ECD, but nearly a dozen other American solar manufacturers which have sought bankruptcy protection.  As a result, American consumers are left without any choice in the commercial rooftop market—only Defendants' inferior panels.

7.      Defendants' actions to eliminate the United States' most successful solar company, however, have not gone unnoticed by the United States Government.  The Department of Commerce ("Commerce") has already determined that Defendants "dumped" solar panels in the American market at "less than fair value" such that it was necessary to issue massive duties of as much as 31.73% in an attempt to even the playing field for the few remaining American solar manufacturers that have not already been driven out of business.  Similarly, the International Trade Commission ("ITC") determined that American solar panel manufacturers' financial condition "worsened throughout the period of investigation as the volume and market

4

share of subject imports grew, even though the industry was experiencing rapidly increasing demand." (Exhibit A, attached.)

8.      Of course, these governmental determinations are of little comfort to once-flourishing ECD, whose only hope of redress after decades of all kinds of significant investment is through this action. By this complaint, ECD seeks compensation for the loss of the more than $950,000,000, the book value of ECD, and more which Defendants destroyed. However, ECD's progressive ingenuity over the past several decades across multiple industries is immeasurable, and therefore can never be fully recouped. Unfortunately, the American solar industry will never be the same.

### Jurisdiction and Venue

9.      This Court has jurisdiction over this action under 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy. In addition, this Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is diversity of citizenship among the parties.

10.     Venue is appropriate in this District under 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b), (c), and (d) because Defendants transact business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District. Each of the Defendants regularly transacts business within the Eastern District of Michigan. Trina has also contracted with Hemlock Semiconductor Group ("Hemlock"), a leading supplier of silicon to the photovoltaics industry based in Hemlock, Michigan. In fact, Trina described its contract with Hemlock as providing Trina "the ability to meet [its] future requirements." D&R Energy Services, Inc., a solar energy service provider based in Brighton,

Michigan, lists Trina along with Suntech as a featured manufacturer in its online advertisements. Clearly, Trina has intentionally availed itself of Michigan law.

11.     Yingli also regularly conducts business in Michigan.  In 2011, Yingli contracted with Hemlock for the purchase of $1.6 billion worth of silicon over seven years.  Further, Yingli contracted to sell panels through Enerex, LLC, a supplier of green energy products based in Harrison Township, Michigan.  These actions are evidence of Yingli's intentional participation in Michigan's economy and purposeful availment of Michigan law.

12.     Suntech has sold its solar panels through Millennium Planet, LLC, a wholesale distributor of commercial and residential solar applications based in Novi, Michigan.  D& R Energy Services, Inc. also lists Suntech as a featured manufacturer in its online advertisements. Astrum Solar is a licensed contractor in Michigan and solar energy service provider with substantial operations across Michigan.  Suntech is a top supplier to Astrum Solar's Michigan operations.

13.     The conduct of Defendants and their co-conspirators described in this complaint was within the flow of, was intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.  Defendants' conduct, and that of their co-conspirators, further substantially affected commerce in Michigan, and accordingly, Defendants have purposefully availed themselves of Michigan's laws.

### Intradistrict Assignment

14.     Pursuant to Eastern District of Michigan Local Rule 83.10, this action should be assigned to the Southern Division.  ECD conducted substantial operations in Michigan via its headquarters in Auburn Hills, Michigan, and through its wholly-owned subsidiary United Solar Ovonic LLC, based in Auburn Hills, Michigan.

**Parties**

15.     ECD was a manufacturer of solar panels based in Auburn Hills, Michigan, and carried out its day-to-day business operations from there.  Beginning in 2003, ECD produced solar panels at four facilities in Auburn Hills and Greenville, Michigan, with capacity to produce over 180 MW per year.

16.     ECD created its innovative solar panel after nearly 30 years of research aimed at perfecting the proprietary and technological processes involved.  Its solar panels, featuring flexible laminate substrates with a self-adhesive backing and deposited with a thin film photovoltaic material, were targeted for commercial and industrial rooftop applications. Whereas most conventional solar panel producers, including Defendants, used well-known processes and widely available equipment, ECD designed, developed, and manufactured its own automated production equipment based on proprietary process technologies.  As a result, ECD solar panels generated electricity earlier in the day and later into the evening, and performed better in diffuse light and at higher temperatures than conventional crystalline panels.  A testament to ECD's successful processes is demonstrated by the fact that ECD achieved more than $1 billion in sales of its solar panels internationally and across the United States before filing for bankruptcy, establishing it as one of the United States' premier solar panel providers. Before being forced out of business, ECD had approximately 2,500 employees.

17.     Trina Solar Limited ("Trina Limited") is a leading manufacturer of photovoltaic solar panels.  Trina Limited is a New York Stock Exchange listed company, incorporated in the Cayman Islands.  It is managed from its executive offices in Changzhou, Jiangsu Province, China, and makes decisions concerning pricing and distribution of its products in the United States.  As of December 31, 2011, Trina Limited had $2.8 billion in assets, more than $2 billion

in revenues, and over 14,000 employees.  It has offices in Europe, North America, South America, and Asia.  As a result of Trina Limited's aggressive and illegal approach to increasing sales in the United States, sales in the United States increased from $13 million in 2009 to $440 million in 2011, and its market share has climbed steadily through 2012.  On December 19, 2006, Trina Limited listed its ADS on the New York Stock Exchange under the symbol "TSL." Trina Limited completed its initial public offering of 5.3 million ADS on December 22, 2006, and follow-on offerings in July 2009 and March 2010.  Trina Limited wholly owns eight subsidiaries that it chose to incorporate in the United States.  Trina Limited[2] also requested to be a voluntary respondent in proceedings before the ITC and Commerce in Washington, D.C.  As discussed below, in these proceedings, the United States government found that Trina dumped its solar panels in the United States and materially injured American manufacturers like ECD.

18.     Trina Solar (U.S.), Inc. ("Trina U.S.") is a 100% wholly owned subsidiary of Trina Limited, and has its principal place of business in San Jose, California.  Its officers overlap with Trina Limited, its financial statements are consolidated as reported to the SEC, and Trina Limited and Trina U.S. work together to sell and dump Chinese-manufactured solar panels in the American market.  For example, Jifan Gao, the CEO of Trina Limited, also functions as the CEO of Trina U.S.  Trina U.S. acts for and is the alter ego of Trina Limited in the United States and with the understanding that the Chinese-based entity is ultimately in control.

19.     Yingli Green Energy Holding Company ("Yingli Solar") is a leading solar energy company and one of the largest vertically integrated manufacturers of photovoltaic solar panels.

---

[2] For some years, the company operated as Changzhou Trina Solar Energy Co., Ltd.  However, in connection with its incorporation in the Cayman Islands and sale of stock to the American public, Changzhou Trina was made a subsidiary of the holding company Trina Limited, and is an alter ego thereof.  Trina Limited and its subsidiaries are hereinafter referred to collectively as "Trina."

Yingli Solar is a New York Stock Exchange listed company, and is incorporated in the Cayman Islands.  It is managed from its executive offices in Baoding, Hebei Province, China, and makes decisions concerning pricing and distribution of its products in the United States.   As of December 31, 2011, Yingli Solar had $2 billion in assets, more than $2.3 billion in revenues, and over 16,000 employees.  It has offices in North America, Europe, Asia, and Australia.  Like its co-conspirator Defendants, and because of the conspiracy, Yingli Solar's sales in the United States increased from an almost negligible amount to $340 million in 2011.  Yingli's market share has increased significantly in light of the bankruptcy of almost a dozen American solar manufacturers as the result of Defendants' anticompetitive conduct.  On June 8, 2007, Yingli Solar listed its ADS on the New York Stock Exchange under "YGE," and on June 13, 2007, Yingli Solar completed its initial public offering of approximately 26.5 million ADS.  Yingli Green Energy Holding Company sells products under the brand name Yingli Solar.  Yingli Solar markets itself in the United States, through partnerships with U.S. Soccer and American football, among other avenues.  In addition, Yingli Solar also requested to be a voluntary respondent in proceedings before the ITC and Commerce in Washington, D.C., and has also been found guilty of dumping its solar panels in the United States.

20.     Yingli Green Energy Americas, Inc. ("Yingli Americas") is a wholly-owned subsidiary of Yingli International and is a Delaware limited liability company.  Yingli Americas has its principal place of business in San Francisco, California and is headquartered both in San Francisco and New York City.  Yingli Americas' executives overlap with those of Yingli Solar, its financial statements are consolidated as reported to the SEC, and Yingli Solar and Yingli Americas work together to sell and dump Chinese-manufactured solar panels in the American

market.  Yingli Americas acts for and is the alter ego of Yingli Solar in the United States and

with the understanding that the Chinese-based entity is ultimately in control.

21.    Suntech Power Holdings Co., Ltd. ("Suntech Power") is the world's largest

producer of solar panels and a New York Stock Exchange listed company.  While a significant

amount of its operations are in China, interestingly, Suntech Power is a Cayman Islands

corporation.  It is managed from its headquarters in Wuxi, Jiangsu Province, China, and makes

decisions concerning pricing and distribution of its products in the United States.   As of

December 31, 2011, Suntech Power had assets of $4.5 billion, more than $3 billion in revenues,

over 17,500 employees, and delivered its products to over 80 countries across the world.  Due to

the illegal and anticompetitive actions alleged herein, its sales in the United States have gone

from a negligible amount in 2005 to almost $750 million in 2011.   On December 14, 2005,

Suntech Power listed its ADS on the New York Stock Exchange under the symbol "STP."

Suntech completed an initial public offering of 30 million ADS on December 19, 2005 and an

additional public offering of 23 million ADS on May 28, 2009, raising three-quarters of a billion

dollars.  In addition, Suntech Power requested to be a voluntary respondent in proceedings before

the ITC and Commerce in Washington, D.C.  As discussed below, in these proceedings, the

United States government found that Suntech dumped its solar panels in the United States and

materially injured American manufacturers like ECD.

22.    Suntech America, Inc. ("Suntech America") is a 100% wholly owned subsidiary

of Suntech Power.  Suntech America is incorporated in Delaware and based in San Francisco,

California.  Its officers overlap with Suntech Power, its financial statements are consolidated as

reported to the SEC, and Suntech Power and Suntech America work together to sell and dump

Chinese-manufactured solar panels in the American market.  For example, Andrew Beebe served

as Chief Commercial Officer for Suntech Power and the head of global sales and marketing operations for Suntech America.  Suntech America's Chief Financial Officer, Anlin Ting-Masonn, held that same position with Suntech Power through October 10, 2012.  Suntech America acts for and is the alter ego of Suntech Power in the United States and with the understanding that the Chinese-based entity is ultimately in control. Suntech and Suntech America are hereinafter referred to as "Suntech."

### Co-Conspirators

23.     Chinese entities have performed acts to aid Defendants' scheme to dump Chinese solar panels in the United States at unreasonably low and/or below-cost prices, affecting ECD and other American manufacturers.  This, in turn, has resulted in Defendants' complete domination of the American market and left the American consumer without any alternative choices to Defendants' traditional (and inferior) solar panels.

24.     China New Energy Chamber of Commerce ("China New Energy"), established in 2006, is one of the leading trade associations in China for solar and other alternative energy sources.  Yingli's Solar Chairman and CEO is a Director for China New Energy, and the Chairman of Trina Limited and Suntech Power's Chairman/CEO both serve on the board of China New Energy.  China New Energy provided significant assistance and participated in the conspiracy.  As discussed in greater detail below, through China New Energy, Defendants hold regular meetings, share market and industry information, "collaborate," coordinate efforts with the government, and more recently, seek to combat claims of dumping on behalf of its members.

25.     China's National Energy Administration is and has been involved in issuing various commercial directives for the Chinese solar industry.  For example, its Five-Year Plan for the Solar Photovoltaic Industry (the "Five-Year Plan") sets forth the goals for solar

photovoltaic ("PV") production, domestic energy consumption, and export.  Importantly, the Five-Year Plan calls for the promotion and expansion of China's top PV manufacturers, such as Defendants.  Focus on this industry is not surprising given that Chinese companies exported $20.2 billion worth of solar products in 2010 alone.  Indeed, rather than using the products manufactured in China to meet China's unquenched energy needs and environmental targets, Defendants instead, as part of their conspiracy, exported their solar products (the "Export Plan").  In fact, each of the Defendants exported and dumped more than 95% of their products.

26.     As part of the Export Plan, the China Development Bank, the Bank of China, and the Export-Import Bank of China loaned Defendants over $17 billion at below-market rates, as described more fully below.  These loans are used by Defendants who then export 95% of their product and dump solar panels on the American market at irrationally low and/or below-cost prices.  Defendant Suntech has admitted that its $7.3 billion below-market credit line is used to expand capacity—all as part of Defendants' goal of gaining market share at the expense of American companies.  China Development Bank, Bank of China, and the Export-Import Bank of China participated in Defendants' conspiracy and supported them in their actions.  Further, through an "extend and pretend" scheme, the loans are frequently rolled over with payment delayed indefinitely.  Such loans have been cited by Commerce as part of the illegal subsidies provided to Defendants and have no legitimate business purpose.  As noted by the Chief Marketing Officer of another leading American solar manufacturer: "The Chinese strategy is very clear.  They are engaging in predatory financing, and they're trying to drive everybody else out of the market.  When you've got free money[,] you can out-dump everybody below cost."

27.     Chinese polysilicon manufacturers, such as GCL-Poly Energy Holdings Limited, Jiangsu Shunda, and Daqo New Energy Corp. also aided the three Defendants.  Polysilicon is an

essential raw material for the production of Defendants' solar panels.  Defendants are able to obtain polysilicon at prices unavailable to their competitors.  Defendants used these polysilicon manufacturers to conceal their true costs of production and as part of the Defendants exporting 95% of their product into the United States and materially damage to American commerce.

### The Relevant Product and Geographic Markets

28.     The relevant market for purposes of this action is the market for the sale of photovoltaic solar panels used in commercial and industrial rooftop installations (typically 1MW – 5MW) in the United States.  ECD sold the majority of its panels to commercial building original equipment manufacturers; engineering, procurement and construction contractors; distributors; utilities; and directly to large end-users.

29.     Commercial and industrial rooftop systems, such as those offered by ECD and Defendants, are installed where power is consumed, thereby avoiding the burdensome costs of maintaining a centralized electricity generation system and attendant distribution infrastructure costs.

30.     ECD's panels produced on average 8% to 20% more kilowatt hours of electricity per rated kilowatt of power output on an annual basis than similarly priced conventional solar modules.  For example, an independent study measuring the annual energy yield (kWh/kWp) during a period of eight years found that ECD's panels had a higher energy yield as compared to crystalline silicon technologies, such as those sold by Defendants.  ECD's panels produced 1,757 kWh/kWp compared to 1,529 produced by its nearest competitor, the average c-Si panel sold by Defendants—a 15% advantage.

31.     ECD sold more than 3.5 million laminates, or roughly 500 MW of installations, a material portion of which have been utilized in hundreds of commercial and industrial installations across the United States over the past 30 years.  ECD primarily sold its systems to

value-added resellers, including system integrators and roofing materials manufacturers, which then resold them to various system owners, including third-party investors, manufacturers, wholesaler-distributors, big-box retailers, government entities, and utility companies.

32.     The total commercial and industrial rooftop area viable for installation in the United States is an estimated 30 billion square feet, representing a potential market of approximately 200,000 megawatts of power.  This represents more than $200 billion of financial opportunity for rooftop solar manufacturers, almost all of which is untapped.

33.     Polysilicon-based solar panels, such as those produced by Defendants, and thin-film panels, such as those produced by ECD, compete against each other in the commercial and industrial rooftop marketplace.  Before Defendants destroyed ECD, the parties were competitors in the commercial and industrial rooftop photovoltaic marketplace.

34.     The relevant geographic market is the United States.  Defendants operate in this marketing area.  Defendants treat the United States as a single and distinct geographic market. The ITC and Commerce (in actions in which Defendants are respondents) similarly have confirmed that the United States is a relevant market.  Likewise, Shi Zhengrong, the chief executive and founder of Defendant Suntech Power, admitted that the United States is one common market.

35.     There are substantial barriers to entry into the production of commercial and industrial rooftop solar systems, particularly for competitors of ECD.  ECD's products were based on flexible thin-film silicon and roll-to-roll manufacturing technologies, as evidenced by its rich patent portfolio.  ECD's intellectual property and successful history of producing industry-progressing technologies provide significant barriers to entry for potential competitors.

36.     The cost for acquiring the necessary land and commodities, and constructing the required plant facility is prohibitive.  To enter into this business, one must also hire hundreds of highly educated employees (virtually all of Defendants' chief executives hold advanced degrees in science or business) and invest tens of millions of dollars in research and development in order to obtain scalability.  ECD's technology and processes, protected by its intellectual property, were already well established and posed a substantial roadblock to Defendants in the commercial and industrial rooftop market.  ECD's successful solar panel system, with its lower cost of installation due to its self-adhesive nature, was a barrier to Defendants' complete domination of the market—so long as ECD, and its technology, enjoyed control over a substantial portion of the American solar market, Defendants would not have been able to dominate the commercial and industrial rooftop market.

37.     The barriers to entry are further highlighted by the fact that technology in the commercial and industrial rooftop solar photovoltaic market is constantly evolving.

38.      ECD's panel had a patented three junction design consisting of blue, green and red absorption cells, each with varying levels of silicon germanium, placed on a single, flexible stainless steel substrate.  Each layer may include complex grading or profiling of the very thin semiconductor materials within each component layer, resulting in higher conversion efficiency and higher energy yield compared to traditional technologies.

39.     ECD also patented a process for attaching solar laminates to rooftops, known as "Peel-and-Stick."   Attachment requires merely removing a thin sheet of polymer to expose the rear surface of a solar laminate to which adhesive has been fixed, and which is then firmly affixed to a subjacent surface.

40.     ECD also designed, developed and optimized a proprietary roll-to-roll automated process for manufacturing solar cells, and at the time of filing for bankruptcy was the only commercial scale roll-to-roll manufacturer of flexible panels.  ECD's process offered significant manufacturing benefits over traditional batch process manufacturing, with the stainless steel roll moving in a continuous manner through four machines to complete the solar cell fabrication that made up ECD's solar panels.

41.     ECD's panel installations had numerous advantages over the traditional PV systems manufactured by Defendants, including higher electricity output per rooftop, reduced balance-of-system costs, easier installation, lower weight and higher flexibility, no rooftop penetration, and superior wind resistance of winds greater than 185 mph, or a category 5 hurricane.

42.     Whereas many solar companies, including Defendants, recently entered the solar panel industry in the past ten to fifteen years, ECD has been a premier solar company with an established record of dependability and sales for years.  ECD was known in the industry to have a high-quality product and as a price leader before its sudden elimination.

43.     Before Defendants' scheme started having devastating effects, ECD had experienced robust revenue growth for years, and expected such growth to continue—had it not been for Defendants' agreement to attack the American market and push ECD into bankruptcy. For fiscal year 2008, ECD earned $239.4 million in revenue from sales of its solar panels.  In 2009, ECD earned over $302 million in revenue from solar panel sales.  By 2013, ECD was projected to have $550 million in utility sales alone. One of the key reasons for its projected growth was ECD's superior energy output per panel.  Up until the eve of its collapse, ECD's

energy output per panel was still superior to that of its competitors, but even ECD's superior product could not compete with the plunge in pricing brought on by Defendants.

44.     Once Defendants' scheme took effect, ECD's revenues began declining.  ECD's revenues from solar panel sales fell to $211 million during FY 2010, and subsequently to $193 million for FY 2011.  There is simply no explanation for ECD's sudden decline in revenue other than Defendants' illegal sales driving it from the marketplace.

**Defendants' Unlawful Conduct**

45.     The Defendants sold Chinese-manufactured solar panels at unreasonably low and/or predatory prices.  This agreed-upon attack on the American solar power industry started in 2008 and has continued for the past five years, during which time the three Defendants agreed to and simultaneously reduced prices at rates in tandem by approximately 75%.  This massive price reduction was the only way Defendants could compete with ECD—to so debase the pricing structure for their inferior traditional panels that the technologically superior ECD panels could not be purchased and utilized by the American commercial rooftop consumer.

46.     By 2011, the effect on American industry was decisive.  At least twelve domestic manufacturing plants have been shut down and ten other companies have declared bankruptcy.  As a result, employment in these American factories has been decimated and the utilization of American raw materials and suppliers has been materially injured.  Domestic employment in the solar panel industry has simply been "replaced" by Chinese manufacturing, Chinese employment, and the use of Chinese raw materials.

47.     American companies and plants have been forced out of the solar market because of Defendants' illegal scheme, as shown in the table below:

| Company | Status |
|---|---|
| Energy Conversion Devices Inc. (Michigan) | Bankrupt |

17

| Solyndra, LLC (California) | Bankrupt |
| SpectraWatt, Inc. (New York) | Bankrupt |
| Evergreen Solar, Inc. (Massachusetts) | Bankrupt |
| Abound Solar (Colorado) | Bankrupt |
| Hoku Solar Inc. (Hawaii) | Bankrupt |
| Signet Solar (California) | Bankrupt |
| EPV Solar (New Jersey) | Bankrupt |
| Stirling Energy Systems (Arizona) | Bankrupt |
| Satcon Technology Corp. (Massachusetts) | Bankrupt |
| BP Solar (Maryland) | Closed operations in December 2011 |
| Solasta Inc. (Massachusetts) | Closed operations in July 2010 |
| Senergen Devices (California) | Closed operations in March 2010 |
| Ampulse (Colorado) | Closed operations in December 2012 |
| Global Watt (California) | Cancelled plans to build plant in Saginaw, Michigan in January 2012 |
| GreenVolts (California) | Closed operations in September 2012 |
| Global Solar Energy (Arizona) | Closed operations in December 2012 |
| Sencera Solar (North Carolina) | Closed operations in December 2012 |
| Skyline Solar (California) | Closed operations |
| Solon Corporation (Germany) | Closed U.S. facility in Arizona |
| Solar World (Oregon) | Closed California and Oregon facility |
| Amonix (California) | Closed Nevada facility |

48.     As a result of their unlawful scheme, Defendants have successfully increased their collective market share to in excess of 80%.  Defendants have achieved their agreed-upon goal of controlling the American solar market and driving out American technology and competitors whose superior rooftop technology offered commercial rooftop consumers a choice.  Finding themselves now able to manipulate the market with their newly achieved market power, Defendants can freely raise prices, coordinate output and distribution, and ensure employment in Chinese manufacturing facilities, immune from the troublesome American competition that heretofore had stood in the way of Defendants' market domination.

49.     The unlawful dumping of solar panels by the three manufacturers, assisted by other Chinese entities, has been confirmed by findings of the Department of Commerce and the

International Trade Commission, which conducted hearings on this unreasonable dumping scheme.

50.     The findings of these government investigations include a conclusion on December 16, 2011 by the ITC "that the solar manufacturing industry in the United States has been materially injured by reason of the subsidized Chinese polar panels that are sold at less than fair value in the United States."

51.     Commerce determined that Defendants had obtained polysilicon at less than adequate remuneration, preferential loans at below market rates, land for less than adequate remuneration, and other countervailing subsidies.

52.     These findings are adopted as part of the allegations of this complaint and are fully set forth in Exhibit A attached to this complaint.  These findings are admissible under Federal Rule 803(6).

53.     The conclusions of the International Trade Commission and the Department of Commerce regarding joint activity to destroy American commerce is demonstrated in the chart below—all three Defendants began dumping products in the American market *at the exact same time* and in markedly parallel form.  The timing of repeated pricing changes (steadily reducing import prices) after meetings in China cannot be said to be coincidental when this many price reductions occurred at the same time.  The similarity of Defendants' pricing behavior completely belies any claim of independent action.



54.     In just those years demonstrated above, each of the three Defendants "jointly" cut their prices by 61% to 66%.

55.     Defendants acted contrary to rational economic rules.  Economic theory dictates that, all else equal, a rational actor in the market will <u>increase</u> prices when <u>demand is increasing</u> in order to maximize his profits.

56.     In early 2009, demand in the American market was expected to increase significantly through 2012, as set forth below.



57.     Reality matched these expectations and American demand for solar panels has almost doubled every year since 2007.



58.     Furthermore, even Defendants themselves expected demand to increase.  For example, in June 2009, Suntech's Chief Strategy Officer planned for the American market to triple in 2010.

21

59.     At a time when demand was rising, and when Defendants recognized that demand was rising, Defendants curiously began to slash their prices in an effort to aggressively capture market share by running American companies out of business and to ultimately drive all competition from the marketplace.  With their inferior technology, this was the only way Defendants could compete with the technologically superior ECD panels.

60.     In the absence of Defendants' agreed-upon attack on ECD and their conspiracy to price at artificially low and/or below-cost prices, any one of the Defendants—acting unilaterally—would have sought to sell at a profit-maximizing price.  But, as part of Defendants' illegal scheme to deprive American consumers of ECD's technologically superior product and ultimately reduce any consumer choice, Defendants flooded the American market with their inferior and low-priced panels.  Because of their artificially low prices, Defendants essentially left the consumer with no choice but to purchase their traditional silicon panels.

61.     According to an informant, Trina regularly sold its product at below-cost prices in the United States.  Trina U.S., which functioned as the American distribution arm of Trina Limited, obtained panels from Trina Limited at a set price to sell into the United States.

62.     In fact, Trina had an entire procedure in place to seek and obtain permission to sell solar panels below cost.  A Trina salesman seeking to make the below-cost sale would ask permission of the Trina U.S. controller.  The controller would then speak with the Chief Commercial Officer of Trina U.S., who in turn, would speak to Trina Limited's CEO and Chairman, Gao Jifan and obtain permission for the below-cost sale.  Such permission was routinely sought and regularly obtained from Gao Jifan, who is the same Trina executive who conspired with other Defendants at China New Energy forums discussed herein.

22

63.     Defendants also used their trade association, China New Energy, to fix prices at artificially low rates and to flood the market with an over-supply of polysilicon solar panels.  As part of China New Energy's stated goals, Defendants "collaborated" amongst themselves—"We encourage a spirit of cooperation and collective assistance amongst our members."

64.     According to China New Energy, it takes its role in providing valuable information about activities in all areas of "new energy" very seriously.  For that purpose, regular meetings are held between members' top executives and others to discuss "cooperation and collaborative efforts between the members."  As noted above, the Chairmen of Suntech and Trina serve on the board of China New Energy, and the Chairman of Yingli serves as a director.  Following various meetings facilitated through China New Energy, prices for solar panels fell and Defendants all continued to export more than 95% of their production by agreement of Defendants.

65.      China New Energy provided a vehicle through which Defendants "cooperated and collaborated" to develop a pricing and distribution strategy to dominate the American market.  This trade association was utilized as part of Defendants' overall plan to ensure American solar manufacturers, particularly ECD, are driven out of the market.

66.     Defendants were able to meet and communicate at the annual China New Energy International Forum (the "Forum"), the signature event of China New Energy.  The chairmen of Trina, Yingli, and Suntech have been featured speakers at the Forum numerous times since its inception in 2006.

67.     After each Forum, each Defendant substantially reduced the price of imported solar panels by the same amount:  40%, 18%, and then 20%.

68.     The second "Forum" was held December 11-12, 2007, at the Xizhou Garden Hotel in Wuxi City.  The Forum brought together the conspirators and others in order to "hold communications" and to "build the platform of summit-level exchanges and cooperation."  Shi Zhengrong, Chairman and CEO of Suntech, and Gao Jifan, Chairman and CEO of Trina, appeared at these events, and Zhengrong specifically discussed making Chinese solar producers into the "world's outstanding brand."

69.     Upon information and belief, leaders from Trina, Yingli, and Suntech met at this Forum, discussed prices, and agreed to lower prices uniformly.  Following that meeting, solar panel prices for each of the Defendants fell approximately 40%.

70.     A third Forum was held on November 27-28, 2008, at the Beijing Diaoyutal Guesthouse.  Shi Zhengrong and Gao Jifan, along with Ding Qiang, Vice Chairman of Tianwei Group (an entity that shares ownership of one of Yingli's primary operating subsidiaries) all attended this meeting.  In addition, they participated in discussions concerning developing "High-end dialogue between top leaders of PV enterprises."

71.     Upon information and belief, leaders from Trina, Yingli, and Suntech met at this Forum, discussed prices, and agreed to lower prices uniformly.  Following that meeting, solar panel prices for each of the Defendants fell another 18%.

72.     A fourth Forum was held on January 20-22, 2010, at the National Convention Center in Beijing.  It was a gathering of industry leaders with the admitted goal of promoting "cooperation." Again, Shi Zhengrong, Gao Jifan, and Ding Qiang all attended.

73.     Upon information and belief, leaders from Trina, Yingli, and Suntech met at this Forum, discussed prices, and agreed to lower prices uniformly.  Following that meeting, solar panel prices for each of the Defendants fell an additional 20%.

24

74.     As leaders of China New Energy, Defendants also met regularly at quarterly chairmen's meetings, annual council meetings, and regular general meetings.  These meetings provided additional opportunities to coordinate and continue Defendants' cartel that drove ECD and other American manufacturers out of business through the price fixing, dumping, and anticompetitive scheme alleged herein.

75.     During 2010 and 2011, sales executives at Trina and Suntech regularly traveled, met, and socialized—conduct inconsistent with independent action by Defendants.

76.     Defendants' conspiracy and agreement was aided by various other co-conspirators.  Through the assistance and cooperation of these companies and organizations, Defendants conspired together and agreed to hide the true costs of producing their solar panels, make concerted pricing and distribution decisions, and ultimately eliminate ECD and other American manufacturers from the market.

77.     Each Defendant also demonstrated a common course of dealing and agreement through their exporting 95% or more of their production and flooding the American market, rather than selling in their own domestic market.  This massive level of export simply defies all logic in light of China's huge need not just for energy, but clean energy.  According to the United States Energy Information Administration, China leads the world in energy consumption, with its use doubling in just the last decade.  Rather than meeting these needs through solar energy or other domestically produced forms of energy, China instead has become the world's second largest importer of oil—preferring to import the energy it needs while selling products in the United States at irrationally low and/or below-cost prices that could fulfill at least part of its energy demands.

78.     Consistent with their conspiracy, Trina and Yingli share the same corporate headquarters address in the Cayman Islands.[3]

79.     The meetings between Defendants and the "in tandem" reduction in pricing instituted following those meetings demonstrates that Defendants did not act independently. Each Defendant decided to sell products into the United States at unreasonably low and/or below-cost prices with no motive to operate profitably, which further demonstrates that their action was not independent. The only reasonable and plausible explanation for this conduct is that the Defendants agreed to this joint activity.

**Antitrust Injury**

80.     Defendants' sales at unreasonably low prices, far below fair value and/or below cost, were directed at destroying competition, not benefitting consumers, and in the long run, neutralizing or destroying competition in the United States for commercial and industrial rooftops. Defendants directly harmed competition in the United States for commercial and industrial rooftop solar panels by reducing consumer choice, stifling innovation, drastically undercutting solar panel prices, and forcing a substantial part of American production into bankruptcy.

81.     Defendants' imported solar panels dramatically reduced prices in a sustained effort that dumped their product at unreasonably low and/or predatory prices to destroy and injure competitors, and over time, all competition. Defendants used conduct that had a direct, substantial and reasonably foreseeable effect on domestic commerce. Alternatively, the steady

---

[3] Trina's CEO holds over 242 million shares of Trina stock, worth over $5.68 billion, in a Cayman Islands trust of which he is the settler and sole member.

and sustained low and/or predatory pricing and the resulting destruction of American commerce resulted in Defendants having power and control over entry and price so that Defendants are able to raise prices and thus injure consumers.

82.     Prior to being destroyed by Defendants' illegal agreement, the American solar industry was a prosperous collection of independent manufacturers who employed thousands of workers in their various plants and location and purchased hundreds of millions of dollars of materials to manufacture solar panels that necessarily supported thousands of other workers employed in the enterprises that produced those materials.  The American solar industry included sophisticated technologies that resulted in the highest quality product being made available to the American consumer.

83.     The solar industry in the United States was experiencing considerable growth and the prospects for continued profits, increased employment and demand were substantial.  While the American solar industry was planning additional production, additional purchases of raw materials, the increased use of improved technology and additional hiring to suit the needs of this growth industry, Defendants were planning their own version of the American solar market.  In the long term, as a result of Defendants illegal scheme, American consumers will pay more than they would in a competitive market and be denied access to innovative technology.

84.     Defendants' market power—obtained as a result of their illegal scheme—allowed Defendants to maintain and increase Chinese employment and the use of Chinese manufacturing at the expense of American production, American employment, and American technology and materials.

**ECD's Damages**

85.    Defendants simply could not compete (lawfully) on the merits in the American rooftop commercial market.  So, through their unlawful scheme alleged herein, they sought to deny—and succeeded in denying—the American consumer access to ECD's superior technology, and any future innovative products ECD or the American entrepreneurial spirit may uncover.

86.    ECD was directly injured by the importation of Chinese manufactured solar panels at unreasonably low prices, far below fair value and/or below cost.  ECD was simply unable to match the unlawful prices offered by Defendants and lost substantial business, eventually requiring it to declare bankruptcy.

**The Restraint of Trade:  Defendants' Violation of Section 1 of the Sherman Act**

87.    ECD repeats and re-alleges the allegations of the proceeding paragraphs as if fully set forth herein.

88.    Trina, Yingli, and Suntech have conspired to import Chinese solar panels at prices that destroyed a majority of the American commerce in the solar panel industry.  The conduct alleged is a <u>per se</u> restraint of trade.  This conspiracy has threatened the proper operations of the American free market economy.  It is a practice on its face that restricts competition.  Indeed, the nature and effect of this practice is so plainly anti-competitive that no elaborate study of the industry is needed to establish its illegality.

89.    In the alternative, these Chinese manufacturing Defendants have unreasonably restrained trade by fixing prices and collectively agreeing to dump their  of Chinese production in the United States.  It does not promote competition; the acts and practices alleged have destroyed competition.

    (a) An agreement to sell Chinese manufactured solar panels at unreasonably low or below cost prices with no motive or purpose to maintain profits in order to destroy an American industry is a per se restraint of trade.  Alternatively, the conduct is an unreasonable restraint of trade.

    (b) An agreement by foreign entities to fix prices and dump solar panels made in China in the United States at unreasonably low prices violates the Sherman Act as amended in the Foreign Trade Antitrust Improvements Act in that this conduct has had a direct, substantial, and reasonably foreseeable effect on domestic commerce.

### Combination to Dump Product and Fix Prices: Defendants' Violation of the Michigan Antitrust Reform Act § 445.772

90.    ECD repeats and re-alleges the allegations of the preceding paragraphs as if fully set forth herein.

91.    Michigan's Antitrust Reform Act prohibits any "contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce."

92.    Defendants knowingly and intentionally combined and conspired with each other, with the co-conspirators named herein, and with others not yet identified, with the specific intent to fix prices of Defendants' solar panels at unreasonably low and/or predatory levels in the American market, to dump their products in the American market, and for the purpose of destroying fair competition in the American market.

93.    In furtherance of Defendants' combination and conspiracy, they collectively agreed to price, offer for sale, and did sell solar panels below cost in the American market.

94.    Defendants' intent in pricing their products at unreasonably low and/or below cost levels was predatory.  Defendants dumped artificially low-priced products on the American market for an illegal purpose—namely to eliminate legitimate competition and to gain controlling power over the market.  Defendants possessed the specific intent to collectively dump solar panels at irrationally low and/or below-cost prices on the American market in order to drive

out competition, as evidenced by their willingness to take losses in order to drive American companies out of business and by their own admissions.

95.     Defendants' price fixing and dumping has harmed competition in the American market for commercial and industrial rooftop solar panels by reducing consumer choice, stifling innovation, and undercutting other solar panel producers and forcing them into bankruptcy in the past several years,

96.     ECD was injured in fact by the conspiracy of Defendants and other co-conspirators because, despite superior technology and an established and consistent market for their product, ECD was unable to match the unlawful prices offered by Defendants and ultimately declared bankruptcy.

97.     Defendants have effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares.   The combination and conspiracy to fix maximum prices and to dump product in the solar panel market in the United States violates Michigan's Antitrust Reform Act.

98.     ECD has suffered an antitrust injury as a direct and proximate result of the combination and conspiracy between Defendants and the co-conspirators, and Defendants therefore are liable for treble damages, costs, and attorneys' fees in an amount to be proved at trial.

**Prayer for Relief**

99.     Wherefore, Plaintiff prays that the Court enter judgment as follows:

A.      That the conduct alleged herein constitutes an unlawful conspiracy and combination to fix prices at unreasonably low and/or predatory levels and to dump product in violation of Sections I of the federal Sherman Antitrust Act;

B.      That the conduct alleged herein constitutes an unlawful combination to fix prices

at unreasonably low and/or predatory levels and to dump product in violation of Section 445.772 of the Michigan Antitrust Reform Act;

C.     That judgment be entered against Defendants and in favor of ECD in an amount not less than the exact amount to be determined by the jury;

D.     That the Court enter judgment against the Defendants, trebling the jury verdict;

E.     That judgment be entered against Defendants and in favor of ECD for pre-judgment and post-judgment interest;

F.     That an order be entered awarding ECD for its expenses and costs of suit, including reasonable attorneys' fees, to the extent allowed by law.

Dated: October 4, 2013                    WINSTON & STRAWN LLP

By: /s/ W. Gordon Dobie
By: /s/ Derek J. Sarafa
Attorneys for Plaintiff
ENERGY CONVERSION DEVICES
LIQUIDATION TRUST

WINSTON & STRAWN LLP
W. Gordon Dobie
wdobie@winston.com
Derek J. Sarafa (P#57088)
dsarafa@winston.com
William C. O'Neil
woneil@winston.com
Edward L. Foote
efoote@winston.com
35 West Wacker Drive
Chicago, IL 60601
Telephone: 312-558-5600
Facsimile: 312-558-5700

Robert B. Pringle
101 California Street
San Francisco, CA 94111
Telephone: 415-591-1000
Facsimile: 415-591-1400
rpringle@winston.com

31